UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---------------------------------------------------x

UNITED STATES OF AMERICA,

v.

ROY JOHANNES GILLAR, JERRID DOUGLAS, and HAROLD MIGNOTT,

*Defendants*.

---------------------------------------------------x

Hon. Esther Salas

No. 2:17-cr-00544-ES

**DEFENDANTS' MOTION TO COMPEL DISCOVERY**

GELBER & SANTILLO PLLC
Kristen M. Santillo, Esq.
Fern Mechlowitz, Esq.
24 Church Street, 2nd Floor
Montclair, NJ 07042
Tel: 212-227-4743
Fax: 212-227-7371
ksantillo@gelbersantillo.com

*Attorneys for Defendant Jerrid Douglas*

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Alison Brill
Assistant Federal Public Defender
District of New Jersey
800 Cooper Street #350
Camden, NJ 08102
609-489-7457 (phone and fax)
alison_brill@fd.org

*Attorneys for Defendant Roy Johannes Gillar*

DUANE MORRIS LLP
Eric R. Breslin, Esq.
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Tel: 973-424-2000
erbreslin@duanemorris.com

Melissa S. Geller, Esq.
22 Vanderbilt
335 Madison Ave., 23rd Floor
New York, New York 10017
Tel: 212-692-1000
Fax: 973-556-1562
msgeller@duanemorris.com

*Attorneys for Defendant Harold Mignott*

## TABLE OF CONTENTS

**Preliminary Statement** ..... 1

**Background** ..... 1

**Argument** ..... 6

**I. Standards for obtaining relief under *Brady* and for newly discovered evidence** ..... 6

**II. Relevant Procedural History** ..... 8

**III. What the defendants can piece together about Srivastava** ..... 10

**IV. Srivastava's outrageous trial testimony** ..... 17

**V. Defendants can show good cause for their discovery requests.** ..... 21

A. **Defendants request that the government be compelled to provide relevant documents and answer narrow interrogatories.** ..... 23

B. **Request for an evidentiary hearing.** ..... 25

**Conclusion** ..... 26

# TABLE OF AUTHORITIES

**Cases**


*Banks v. Dretke*, 540 U.S. 668 (2004) ........................................................................22

*Brady v. Maryland*, 373 U.S. 83 (1963) ..........................................................................6

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) (en banc) .................................21, 23

*Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263 (3d Cir. 2016)...............................23

*Giglio v. United States*, 405 U.S. 150 (1972) ...................................................................6

*Glossip v. Oklahoma*, 145 S. Ct. 612 (2025) .....................................................................8

*Gov't of Virgin Islands v. Fahie,* 419 F.3d 249 (3d Cir. 2005) .......................................7

*Johnson v. Folino*, 705 F.3d 117 (3d Cir. 2013).................................................................7

*Kyles v. Whitley*, 514 U.S. 419 (1995)........................................................................ 6-7

*Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006)...................................................................22

*Randolph v. Beard*, Civ. No. 901, 2014 WL 6065887 (M.D. Pa. Nov. 13, 2014)..........................5

*Roviaro v. United States*, 353 U.S. 53 (1957)...................................................................3

*Strickler v. Greene*, 527 U.S. 263 (1999) .........................................................................6

*United States v. Agurs,* 427 U.S. 97 (1976) .......................................................................7

*United States v. Barbosa*, 271 F.3d 438 (3d Cir. 2001)......................................................8

*United States v. Brown*, Crim. No. 00146-2, 2008 WL 510126 (M.D. Pa. Feb. 22, 2008), *aff'd*, 595 F.3d 498 (3d Cir. 2010) ..........................................................................5

*United States v. Innamorati*, 996 F.2d 456 (1st Cir. 1993) ...............................................4

*United States v. Jasin*, 280 F.3d 355 (3d Cir. 2002)................................................... 7-8

*United States v. Maury*, 695 F.3d 227 (3d Cir. 2012)........................................................6

*United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992).......................................................3

*United States v. Peterson*, 116 F. Supp. 2d 366 (N.D.N.Y. 2000) ...................................23

*United States v. Quiles*, 618 F.3d 383 (3d Cir. 2010)........................................................8

*United States v. Russell*, Crim. No. 16-396, 2018 WL 2088282 (S.D.N.Y. May 4, 2018) ..........22

*United States v. Suarez*, Crim. No. 09-932, 2010 WL 4226524 (D.N.J. Oct. 21, 2010) ..............22

*United States v. Velarde*, 485 F.3d 553 (10th Cir. 2007) ..............................................................5

*United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007) ....................................................................3

**Statutes**

18 U.S.C. § 3500 .........................................................................................................22, 23

**Other Authorities**

Department of Justice Manual § 9-5002 .........................................................................21

Federal Rule of Civil Procedure 26(a) ..............................................................................5

Federal Rule of Criminal Procedure 16(d)(1) .......................................................................3

Federal Rule of Criminal Procedure 33 ........................................................1, 5-6, 9-10

Federal Rule of Evidence 404(b) ...............................................................................9, 12, 18

Rules Governing 2254 and 2255 Cases, Rule 6(b) .............................................................5

## PRELIMINARY STATEMENT

Jerrid Douglas (Kristen Santillo and Fern Mechlowitz, Gelber & Santillo, appearing), Harold Mignott (Melissa S. Geller, Duane Morris, appearing), and Roy Gillar (Alison Brill, Assistant Federal Public Defender, appearing) ("Defendants") move for an order compelling certain discovery. This case is on remand from the Third Circuit for the defendants to renew post-trial motions pursuant to Federal Rule of Criminal Procedure 33, based on newly disclosed *Brady* violations and newly discovered evidence. The Court has discretion to order discovery on a showing of good cause in a case with this unique posture and given the limited materials to which the defendants have access.

## BACKGROUND

The jury convicted Defendants in October 2022, and the Court sentenced each to terms of imprisonment in 2023.[1] The government aggressively fought for and presented a key and controversial witness at trial, Guarav Srivastava. In August 2024, the Wall Street Journal published an article about Srivastava entitled *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats*. The article detailed Srivastava's fantastical cons and frauds perpetuated over several years, including during the time period of the trial. *See* Joe Wallace, Wall Street Journal, *A Fake Spy, Russian Oil and $1 Million Funneled to Democrats: Former business partner claims Gaurav Srivastava scammed millions by posing as a CIA operative; a photo op with Biden* (Aug. 27, 2024).[2]

---

[1] The case originally included a fourth defendant, James Adkins, who died prior to trial.

[2] Available at: https://www.wsj.com/politics/national-security/gaurav-srivastava-scam-e7ca3d26?gaa_at=eafs&gaa_n=ASWzDAgm02XCtLrndenlYchj0Nai7VYRXpdw7243vrA8MxJQTOd1bxghjSApSiFuy9c%3D&gaa_ts=688f745a&gaa_sig=ZsF1MLl2isD5RFkJU9Hnq3B3Pu

Defense counsel immediately sought information from the government about its knowledge of Srivastava's fraud. Seven months later, on March 19, 2025 (the "March 2025 Disclosure"), the Court unsealed a letter from the government disclosing that, while the Wall Street Journal's exposé was allegedly new information to the prosecutors, the government did, in fact, have much to disclose. *See* ECF 757.

First, the government disclosed that it suppressed relevant evidence about Srivastava at trial. On September 29, 2022, the government filed an *ex parte* motion ("September 2022 Application") with now-retired District Judge John Michael Vazquez, requesting permission to conceal from the defense the fact that Srivastava was a paid confidential informant ("CI") for the FBI and another undisclosed government agency, representing that nothing in Srivastava's CI file suggested concerns about his credibility. ECF 757 at 13. The Court, on the strength of the government's submission, granted the order and the defense was never advised. In the March 2025 Disclosure, the government moved to unseal that *ex parte* filing and admitted that the *ex parte* application contained several materially false and misleading statements, including:

(1) that Srivastava's role as a CI ended in December 2021, well before trial, *but actually he continued to be an active CI while he was testifying at trial and for over a year thereafter*;

(2) that Srivastava stopped working as a CI for "strictly administrative reasons," *but failed to disclose that it had possession of reports that called into question his reliability and honesty, including reports from another government agency that stated he was not a credible or honest source;*

---

Mux6Gw_bwYbrggK0ClsaahKQdTW5m_9gcMGFoDTtD8xYEa7jm3hrVR35uQxw%3D%3D (last accessed Aug. 5, 2025).

(3) there was no information in Srivastava's CI file that might call into question his credibility, *but actually the FBI and other government agencies had raised and documented serious concerns about Srivastava's credibility and work as a CI at least as early 2021*; and

(4) Srivastava's work as a CI was unrelated to the alleged fraud at issue at trial, *but actually he had been investigated by the FBI for fraud related to the very same companies about which he testified against the defendants at trial.*

Far from disclosing these concerns about Srivastava's credibility, the government argued in its *ex parte* September 2022 Application that Srivastava's role as a CI actually bolstered his credibility. ECF 757 at 13.

The government also made numerous, material legal errors in its *ex parte* September 2022 Application to Judge Vazquez. In its September 2022 Application, the government cited inapposite cases that the government can, in some instances, withhold the identity of informants from the defense, *see Roviaro v. United States*, 353 U.S. 53 (1957), and then relied on too broad an interpretation of Federal Rule of Criminal Procedure 16(d)(1) to justify its *ex parte* filing. *See* ECF 757 at 13-15. In fact, "good cause" under Rule 16 is established only "on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure. The injury must be shown with *specificity*. Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not support a good cause showing." *United States v. Wecht*, 484 F.3d 194, 211 (3d Cir. 2007) (emphasis added) (citations omitted). The government did not cite, nor did it attempt to satisfy, this "good cause" standard required under Rule 16(d) to justify nondisclosure of the information about Srivastava. ECF 757 at 14-15. Nor did the government provide the relevant information for the Court to review *in camera*. *See, e.g., United States v.*

*Minsky*, 963 F.2d 870, 874 (6th Cir. 1992) (noting "an *in camera* review by the court [of the FBI 302s] was not only proper, but probably required"); *United States v. Innamorati*, 996 F.2d 456, 487 (1st Cir. 1993) (submitting *in camera* for court's determination what potential impeachment information should be disclosed where disclosure would have jeopardized an ongoing criminal investigation). Under these standards, the prosecution should have reviewed Srivastava's FBI files and provided them to the Court for an independent assessment of whether the information could be withheld.

Shockingly, even the government's March 2025 Disclosure – which purported to correct the false statements contained in its September 2022 Application – contained misleading representations. The Government stated in its March 2025 Disclosure that no member of the prosecution team – which it defined as including the "undersigned Assistant U.S. Attorney and the FBI Special Agent assigned to this case" -- knew that Srivastava had been investigated by the FBI for fraud in 2021. ECF 757 at 1, 9. But, on April 1, 2025, upon defense request, the government disclosed a September 2021 memorandum detailing accusations that Srivastava was then committing a fraud. The September 2021 memorandum copied New Jersey FBI Case Agent Elizabeth Hornberger. *See* Ex. A, attached hereto, at 7. At a July 22, 2025, status conference, AUSA Joshua Haber stated that Hornberger did not see this memorandum because this message was received via an FBI Distribution List, on which documents disappear after a few days.

However, this explanation raises more questions than it answers, including whether Hornberger received any other communications from the FBI Los Angeles office regarding Srivastava and why the FBI Los Angeles office copied Hornberger on the memo in the first place. In addition, a second FBI agent from the NJ office, Anthony Czajkowski, was copied on

the same memo and it is unclear what, if any, action he took after receiving this information or why he received it. *See* Ex. A at 7.[3]

In light of the numerous false and misleading statements in both the Government's September 2022 Application to the Court and its March 2025 Disclosure, Defendants specifically asked the Government to disclose the underlying FBI memoranda which the Government summarized in its March 2025 Disclosure, as well as other documents relating to the Government's knowledge of Srivastava's frauds and the benefits that Srivastava received as a CI. *See* Ex. B (Apr. 8, 2025, email from Douglas counsel to AUSA Haber). However, following its production of limited documents relating to the FBI's 2021 investigation of Srivastava's fraud in April 2025, the government refused to produce any additional information.

This motion establishes the "good cause" necessary to compel further discovery. This Court has "considerable discretion" to permit the use of different discovery devices such as document production and written interrogatories, which are appropriate here. *See Randolph v. Beard*, Civ. No. 901, 2014 WL 6065887, at *3-4 (M.D. Pa. Nov. 13, 2014) (discussing discovery tools available under Fed. R. Civ. P. 26(a), which can be employed in habeas cases upon a showing of "good cause"); *United States v. Brown*, Crim. No. 00146-2, 2008 WL 510126, at *1 n.1 (M.D. Pa. Feb. 22, 2008), *aff'd*, 595 F.3d 498 (3d Cir. 2010) (finding that discovery for Rule 33 motions should governed by the habeas discovery rules, which permit requests upon a showing of "good cause"); Rule 6(b) of the Rules Governing 2254 and 2255 Cases (authorizing discovery under Rules of Criminal or Civil Procedure); *United States v. Velarde*, 485 F.3d 553,

[3] Due to the sensitivity of many of the exhibits, Defendants have provided copies of the exhibits to the Court under seal, via email, and have not filed them on the public docket.

560 (10th Cir. 2007) (permitting evidentiary hearing and issuance of subpoenas for Rule 33 motion).

## ARGUMENT

### I. Standards for obtaining relief under *Brady* and for newly discovered evidence

The Defendants intend to file motions to vacate their convictions under the standards applicable for a new trial under Federal Rule of Criminal Procedure 33 based on newly discovered evidence and the government's clear violations of *Brady v. Maryland* and *Giglio v. United States*.

*Brady v. Maryland* requires the government to provide the defense with all exculpatory evidence and impeachment material that it possesses or could obtain through due diligence. 373 U.S. 83 (1963). *Giglio v. United States* requires disclosure of information relevant to the credibility of prosecution witnesses. 405 U.S. 150 (1972); *see also United States v. Maury*, 695 F.3d 227, 249 (3d Cir. 2012) (explaining requirement to disclose *Giglio* material "where the reliability of a given witness may well be determinative of guilt or innocence"). The failure to provide *Brady* material is a violation of due process, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87; *see also Strickler v. Greene*, 527 U.S. 263, 288 (1999) ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.") (internal citations omitted). In addition, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

To establish a due process violation meriting a new trial under *Brady*, a defendant must prove that the government suppressed favorable information that is "material either to guilt or to punishment." *Strickler*, 527 U.S. at 281–82, 290. Materiality is broadly defined and includes evidence that "would have raised opportunities to attack ... the thoroughness and even the good faith of the investigation." *See Kyles*, 514 U.S. at 445- 46. Even "inadmissible evidence may be material if it could have led to the discovery of admissible evidence." *Johnson v. Folino*, 705 F.3d 117, 130 (3d Cir. 2013). This is a defendant friendly standard. Evidence will be deemed material if a defendant can show a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; said otherwise, whether the verdict is "worthy of confidence" without that evidence. *Kyles*, 514 U.S. at 434. A *Brady* violation may also warrant dismissal of the case when the Government's misconduct is willful and has resulted in actual prejudice. *Gov't of Virgin Islands v. Fahie,* 419 F.3d 249, 255 (3d Cir. 2005) (discussing "reckless disregard for a defendant's constitutional rights" as constituting "willful misconduct"). The possibility of this sanction is important or else "a prosecutor who sustains an erroneous view of her *Brady* obligations over time will be inadequately motivated to conform her understanding to the law." *Id*. The reason for this easier standard for reversal is the unique role that prosecutors play in our system of justice: "[t]he fact that such evidence was available to the prosecutor and not submitted to the defense places it in a different category than if it had simply been discovered from a neutral source after trial." *United States v. Agurs,* 427 U.S. 97, 111 (1976).

If a defendant moves for a new trial based on newly discovered evidence that does not involve an alleged *Brady* violation, then the standard is more onerous: a defendant must show the new material evidence "would probably result in an acquittal." *United States v. Jasin*, 280 F.3d

355, 361 (3d Cir. 2002) (quoting *United States v. Iannelli*, 528 F.2d 1290, 1292 (3d Cir. 1976)). In addition, a defendant must satisfy the following factors:

> (a) the evidence must be[,] in fact, newly discovered, i.e., discovered since trial;
>
> (b) facts must be alleged from which the court may infer diligence on the part of the movant;
>
> (c) evidence relied on[] must not be merely cumulative or impeaching; and
>
> (d) it must be material to the issues involved.

*Id*.

A defendant may be entitled to a new trial relying solely on "impeachment evidence" if he shows that the newly discovered evidence "strongly demonstrate[s] that critical evidence at the trial against the defendant was very likely to have been false." *United States v. Quiles*, 618 F.3d 383, 392-93, 97 (3d Cir. 2010) (stating that impeachment evidence alone can severely undermine the credibility of a crucial government witness); *compare Glossip v. Oklahoma*, 145 S. Ct. 612, 628 (2025) ("Evidence can be material even if it 'goes only to the credibility of the witness.'") (citations omitted), *with United States v. Barbosa*, 271 F.3d 438, 468 (3d Cir. 2001) (evidence generally considered cumulative and not material if it would merely result in further questioning of a witness about topics addressed during prior testimony).

Having set forth the standards for the Defendants' upcoming motions, it is next essential to put this motion into the context of the case.

## II. Relevant Procedural History

The Defendants were tried on a second superseding indictment. An initial complaint alleged one count of conspiracy to commit wire fraud based on allegations of a scheme to defraud J.R. Holdings, Inc. The complaint included allegations the Defendants also induced by

fraudulent representation "Victim Company B," Srivastava's ostensible cancer research company, to contribute funds. ECF No. 1 at 7 (April 14, 2017). A grand jury issued a seven-count indictment charging a wire fraud conspiracy (Count 1), four counts of wire fraud for wires sent on April 28 and 29, 2016 (Counts 2-5), and two counts of money laundering (Count 6 – Gillar, Count 7 -Douglas). ECF No. 66 (Dec. 18, 2017). A 10-count Superseding Indictment then issued, adding three counts related to different schemes, a wire fraud scheme occurring in 2013 involving Victim 3/Michael Johnson, a farmer in Iowa (Count 6 – Adkins and Mignott), and a wire fraud scheme occurring from March 2015 to June 2016 involving "Victim 4/Company B" (Srivastava/Preadia) (Counts 7 and 8 – Adkins and Douglas). ECF No. 108 (April 16, 2018).

The Court granted Gillar's motion for misjoinder as to Counts Six to Eight of the superseding indictment and ordered the government to advise how it intended to proceed on the three different alleged fraud schemes. ECF No. 253 (Sept. 13, 2019).[4] The Second Superseding Indictment then issued, dropping allegations related to Johnson and Srivastava, and reverting to seven counts: one wire fraud conspiracy, four counts of wire fraud, and two count of money laundering, based solely on allegations of fraud against J.R. Holdings, Inc. ECF No. 260 (Oct. 10, 2019).

The first trial date was set for April 20, 2020. Because the alleged fraud against Srivastava could not be substantively tried in a joint trial, the government moved in limine to admit his testimony against Douglas only under Federal Rule of Evidence 404(b). *See* ECF No.

[4] There were significant additional pre-trial motions, including other motions to sever. In the interest of concision, only the immediately relevant history is set forth here. The defense nevertheless notes that all defendants were raising issues and concerns with the indictments from early in this case and the other pre-trial history will likely prove relevant in the subsequent Rule 33 motions.

340 (April 17, 2020). The Court granted in part and denied in part this motion. ECF No. 375 (June 12, 2020).

The Court postponed the trial due to the pandemic and then re-set it for November 2021. ECF No. 420. The government's production of over 30,000 pages of documents on the eve of trial necessitated adjournment of the November 2021 trial date.

Jury selection was conducted on September 19 and 20, 2022. Trial was held between September 21 and October 21, 2022, with the jury reaching a verdict of guilty on all counts on October 21, 2022.

On June 22, 2023, Gillar was sentenced to 72 months imprisonment and $1.09 million in restitution. His release date from the Bureau of Prisons is November 20, 2025. On June 22, 2023, Mignott was sentenced to 36 months and $1.09 million in restitution. His release date from the Bureau of Prisons is December 21, 2025. On July 6, 2023, Douglas was sentenced to 45 months and $1.09 million in restitution. His release date from the Bureau of Prisons is November 6, 2026. For all three defendants, the $1,109,545 for restitution included approximately $800,000 paid by J.R. Holdings, as well as $250,000 allegedly paid by Srivastava, thus treating Srivastava as a victim for purposes of restitution.

Douglas and Gillar filed opening briefs in the Third Circuit on December 3, 2024. Appeal Nos. 23-2205 and 23-2391. Mignott has not yet filed his opening brief.

On May 13, 2025, in light of the Government's extraordinary disclosure and the parties' joint motion, the Third Circuit stayed the Defendants' appeals for a limited remand so that this Court could consider the Defendants' anticipated Rule 33 motions. ECF 758.

## III. What the defendants can piece together about Srivastava

The Defendants have received little relevant discovery about Srivastava. Much of what defendants know has been gleaned from the March 2025 Disclosure and the pittance of relevant

documents the government has since turned over. These snippets alone show that Srivastava is a fabulist, and that the government was reckless in its presentation of him to the Court, the Defendants, and the jury. His "evidence" became more and more incredible.

At the beginning of the case, the government conducted two interviews with Srivastava in November and December 2016. During those two interviews, Srivastava had little to say about either Gillar or Mignott, mentioning both only in passing, and neither as main players in any fraud. *See* Ex. 3, FBI 302s of Srivastava's Nov.-Dec. 2016 interviews. With respect to Douglas, the notes from the meeting show that Srivastava did not report any of the most inflammatory, controversial statements that later appeared in Srivastava's testimony. *Id.*

The government revealed issues relating to Srivastava's immigration status in a Jencks disclosure in October 2021. In March 2018, Srivastava was advised that his work permit was being revoked because he was not an "alien of extraordinary ability." The NJ FBI then moved three times, in July and December 2018 and on September 10, 2019, for an abeyance of Srivastava's immigration application during the pendency of the trial. *See* Ex. D. This was the last Defendants heard about Srivastava's immigration, which misleadingly suggested that Srivastava received no further benefits from the Government after September 2019.

However, that is exactly when Srivastava began working for the FBI. According to the March 2025 Disclosure, an agent in the Tampa, Florida FBI field office opened Srivastava as a CI on September 20, 2019, almost simultaneously with the filing of the Second Superseding Indictment. *See* ECF No. 757 at 6. As of this filing, the defense must rely only on the government's word as the government has so far refused to produce any documents related to Srivastava's stint as an FBI informant. Among the other unknown key information is how Srivastava came to the FBI's attention in the first place.

According to the March 2025 Disclosure, on October 16, 2019, the FBI paid Srivastava $6,050: $500 for "services" and $5,550 for "travel expenses." ECF No. 757 at 6. Where Srivastava travelled and what services he provided remain unknown. This was just six days after the government filed the Second Superseding Indictment. ECF No. 260 (Oct. 10, 2019).

Just six months later, on April 17, 2020, the government filed a motion to admit 404(b) evidence at trial, consisting of the same conduct that was charged in the Superseding Indictment and dropped as an independent count after the Court ruled on misjoinder. ECF Nos. 340. Specifically, the government sought to introduce evidence alleging frauds on Johnson (against Mignott) and Srivastava (against Douglas). *Id.* All defendants opposed some or all of this proposed 404(b). Mignott, in particular, expressed the concern that, if the government were permitted to introduce all the proposed 404(b) evidence, "[t]he majority of the trial will simply become a trial on extrinsic matters related to other acts evidence." ECF No. 356 at 7.[5]

In August 2020, the FBI closed Srivastava's CI file, purportedly because Srivastava moved to London and "it was difficult to coordinate with him during the COVID-19 pandemic." ECF No. 757 at 6. According to reporting by the Wall Street Journal, while in London Srivastava began his attempts to con his way into the international security and commodities business, claiming to be an operative for the CIA. Among his other escapades, he allegedly flew (by private jet) to meet with a senior military official in eastern Libya to obtain oil in exchange for military services. *Id.* at 19.

[5] As of this date, the government had not disclosed Srivastava's 302 statements from 2016 and nothing in any prior filing suggested that Srivastava could or would proffer testimony about Mignott or Gillar. Douglas conceded that some testimony from Srivastava may be admissible under Rule 404(b), but reserved all objections pending specificity by the government as to what and how much evidence it intended to offer. ECF No. 358.

About a year later, on July 8, 2021, the Court set a trial date of November 15, 2021. ECF No. 420. Just over a month later, on August 11, 2021, the Los Angeles Field office received a report from an Individual ("Fraud Victim") claiming that Srivastava had defrauded him and others of hundreds of thousands of dollars. *See* Ex. A at 1. The Fraud Victim previously reported the fraud a year prior, but the FBI lost the file and so opened a new one. *Id.* The Fraud Victim reported that, in 2016, Srivastava solicited him for investment in Veecon Biotech, LLC, which supposedly held two patents. *Id.* at 1-2. Srivastava convinced the Fraud Victim to invest money and as well as travel, expenses and marketing costs into Veecon, totaling approximately $200,000, which later proved to be a fraud. *Id.* at 15. The Fraud Victim identified at least three others who purportedly put in between $250,000 and $350,000 into Veecon and were also defrauded. Id. at 5, 8-9, 13-15.

Incredibly, on August 27, 2021 the Los Angeles field office, the very same office where the Fraud Victim reported Srivastava's fraud, reopened Srivastava as a confidential informant. ECF No. 757 at 7. The government has not, to date, produced any information explaining how Srivastava came to the attention of the Los Angeles office as a CI or the coinciding of the fraud report and the reopening of his CI file in the very same office.

On September 16, 2021, an agent in the Los Angeles field office drafted another report attaching records substantiating the Fraud Victim's claims. Ex. A at 7. The report copied FBI Special Agent Elizabeth Hornberger, the lead case agent on this case and Anthony Czajkowski, another New Jersey-based FBI agent. *Id.*[6] Srivastava's name was not a common, generic sounding name connected to a moribund matter languishing in the back files. Hornberger

[6] On a recent call with the Government, the Government did not know whether Agent Czajkowski had worked on this case in the past.

received this report just two months before the first scheduled trial date, while she and the prosecutors were actively preparing for trial. Srivastava, with his unique name, had been a centerpiece of the government's case since at least 2018. These records demonstrate that Srivastava perpetrated a scheme remarkably similar to the one that Douglas tried to show at trial that Srivastava perpetrated against Douglas – the Fraud Victim was induced to join Veecon, and spent hundreds of hours and his own funds to market and build the brand, only to be left high and dry by Srivastava. *See* Ex. A. Douglas had much the same experience, pouring hundreds of hours into helping Srivastava rebrand from Veecon to Preadia, setting up, marketing the business, locating sources of investment, and inducing his consulting company to invest over $165,000 in Srivastava's company, only to then discover Srivastava's malfeasance and his unauthorized spending of Preadia's investor money on personal expenses. *See* Trial Tr. 2732-2745.

On October 4, 2021, the FBI closed the investigation into Srivastava, due to the location of the subject in Los Angeles and the "low dollar amount." Ex. A at 23. There does not appear to have been any effort made to investigate the Fraud Victim's claim that others were defrauded up to $750,000.

On October 19, 2021, the Douglas defense team met with prosecutors to discuss certain evidence showing that Srivastava had engaged in fraud and had lied to the Government about key details relating to the case. One day later, on October 20, 2021, Mignott filed a motion *in limine* seeking, at a minimum, an instruction that Srivastava could not offer testimony against him, based on the paucity of allegations made by Srivastava in his 2016 interviews with the FBI. ECF No. 448 at 11.

That very same week, on October 22, 2021, FBI SA Elizabeth Hornberger and AUSAs Jason Gould and Joshua Haber interviewed Srivastava and asked him about many of the issues raised by Douglas. *See* Ex. E (FBI 302 authored by Hornberger from an interview of Srivastava on Oct. 22, 2021). Srivastava purported to address those concerns in the meeting, and the government credited Srivastava, seemingly with little follow up or scrutiny of his statements. The government also ostensibly asked Srivastava about Mignott and Gillar, likely in response to motions *in limine* filed earlier in the week. Unsurprisingly, Mignott and Gillar played a much bigger role in Srivastava's new story. This new disclosure placed Mignott on the phone several times with Srivastava, had Mignott sending him documents, and included a discussion about gold bonds, in which Mignott was never previously implicated. *Id*. at 2. Instead of simply being mentioned, Gillar was now the "big investor," and his name was "always mentioned," and was "often discussed." *Id*. In other words, in the years between 2016 and 2021, after the Court's ruling forced the government to remove Srivastava from the indictment, after hundreds of filings many of which included him, after coming on as an FBI informant, having learned the value of informant status, and after the government faced pressure from evidentiary motions, Srivastava's story became more accommodating to the government's case.

On October 29, 2021, the government made its first disclosure of Jencks Act and *Giglio* materials, including documents showing Srivastava received immigration benefits for participating in this case, but only up through September 2019. *See* Ex. D. The government updated its Jencks and *Giglio* disclosures two more times in November 2021 and September 2022.

At the same time that Srivastava's story was evolving in New Jersey, the FBI field office in Los Angeles also documented issues regarding his "control, reliability, and honesty." ECF 757

at 7. Defendants have not seen but have been told that on December 3, 2021, the Supervisory Special Agent for the Los Angeles field office purportedly drafted a routine "Quarterly Supervisory Source Report" (the "Supervisory Report") concerning Srivastava's CI activity from August 2021 to November 2021. *Id.* In addition to its own troubling assessment of Srivastava, the FBI discussed Srivastava with another government agency which observed that it did not believe Srivastava was "trustworthy and reliable going forward." *Id.* The Supervisory Report made note of the fraud investigation, but according to the Government's summary of this Report, that the complaint "did not pertain to unauthorized illegal activity." *Id.* This is untrue based on the records produced by the government, which show that the investigation was closed because the FBI did not think it was high-value enough and due to Srivastava's location, not that it did not relate to illegal activity. Ex. A at 23.

According to the government, the LA Field Office then closed Srivastava's file on December 8, 2021, with a note that it was not "for cause," and that he was recommended for reopening by a different squad in the LA field office. ECF 757 at 7. According to the government, Srivastava was back on the books as a CI for the LA Field Office by December 15, 2021. *Id.* at 8. During this time, according to the Wall Street Journal, Srivastava convinced a Sudanese militia leader that he was an operative of the CIA and to pay him $3 million to develop good relationships with the United States. ECF 757 at 20. He also began the long con against an international commodities trader by first convincing the trader that the FBI believed the trader was dealing in illicit commodities and then reassuring the trader that Srivastava had set the FBI straight. *Id.* at 20-21.[7]

---

[7] The government claims that Srivastava entered into the "financial transactions" alleged in the Wall Street Journal after the trial. ECF 757 at 8. Unless the government lawyers know information not disclosed, the Wall Street Journal article places these "financial transactions" in

This sparse timeline based on representations by the government, without many of the underlying documents shows a troubling carelessness as to Srivastava's veracity and compels further disclosure.

**IV. Srivastava's outrageous trial testimony**

Meanwhile, the case speeded to trial. Opening statements began on September 22, 2022. Midway through trial, on September 29, 2022, the government filed an *ex parte* letter with the Court seeking to withhold Srivastava's CI status from the defense. Not only did the government falsely represent that there was nothing in the CI file or about Srivastava's work as a CI "that might call into question his credibility," it actually argued that his CI status would "bolster" his credibility. ECF 757 at 13. This was manifestly untrue, but, based on the government's representations, the Court summarily granted the government's application to conceal Srivastava's CI status.

The government sought to establish at trial that the defendants unlawfully took money from two sources and essentially defrauded two sets of victims: (1) $800,000 from Holder and Patel's company, J.R. Holdings; (2) $250,000 from Srivastava, and his cancer company Preadia.[8] According to the government, the Defendants committed this fraud by falsely representing that, upon payment of $1 million, both J.R. Holdings and Preadia would gain access to an SBLC valued between € 500,000 to € 1 billion, to use for their businesses. All of the defendants argued

2022 without more specificity. *Id*. at 19-23. As the trial was at the end of the year, it is safe to assume that Srivastava was, at a minimum, laying the groundwork for these cons well before the trial.

[8] The government also presented 404(b) evidence that Mignott and Adkins defrauded a farmer in Iowa of approximately $90,000. These allegations were significantly earlier and materially different in kind to the allegations related to J.R. Holdings and Preadia.

they acted in good faith, believing the transaction was legitimate. While Douglas communicated extensively with J.R. Holdings about the transaction, 95% of the money went to Gillar. *See* Trial Tr. 2401; GX 700.

All of the defendants challenged the thoroughness of the prosecution's case, and argued that it did not carefully scrutinize evidence that the defendants were acting in good faith and believed the transaction was legitimate and an SBLC would issue. Although Srivastava's testimony was purportedly introduced under Rule 404(b) for the purpose of showing Douglas had a common scheme and his transactions with the named victims were intentional fraud, Srivastava's two days of testimony actually implicated all the defendants in conversations and events. Moreover, his testimony was more detailed and incriminatory than that of the purported victims of the charged conduct.

This was not a scintillating trial. The government devoted the first days of the trial to a slogging nearly line by line read of contracts. Much of the testimony concerned opaque, densely written international commercial paper. In contrast, Srivastava's testimony was *colorful*.[9] Srivastava repeatedly testified that, he only released funds to the Defendants for the transaction because they threatened him with civil and criminal prosecution if he refused, and that it was "quite terrifying," a story not previously recorded in any prior statement. Trial Tr. 1572, 1624,

[9] In addition to being colorful, it was almost certainly false on many fronts. For example, there was a concern that the government submitted a doctored exhibit on Srivastava's behalf: a purported letter from Mike Gowell giving Srivastava permission to use his investment in Preadia for personal expenses. The government quickly smoothed this over with an interview of Gowell by SA Hornberger who produced a brief 302 purporting to establish the authenticity of the document. *See* Ex. F. Upon request, the government also produced two emails purportedly from Gowell to Srivastava to the government, but those emails appeared to have been edited to omit any exchange between Gowell and Srivastava. *See* Ex. G (Oct. 11, 2022 email from J. Haber to K. Santillo, with two attached emails from Srivastava). The government did not further investigate this truncated email exchange, again simply accepting Srivastava's statement that the documents were authentic.

1640, 1642, 1648, 1708-09, 1776, 1778, 1781, 1783, 1833-34, 1850. He testified that he was scared and intimidated into sending money to the defendants. *See, e.g.,* Trial Tr. 1778, 1781.

Srivastava used impactful language, stating at one point that he had been extorted. Trial Tr. 1624. He testified that the defendants told him they "have access to several other government agencies, including some former government officials, and they can create problems for me." Trial Tr. 1708. He testified that his lawyer "received a call from a gentleman impersonating … a federal officer." Trial Tr. 1704; 1709-1710. No other witness proffered anything even remotely alleging the type of strong-arm tactics that Srivastava proffered, and his testimony allowed the government to paint a picture of aggressive, knowing fraudsters for which no other evidence existed, undermining the Defendants' good faith defense. The Wall Street Journal article makes clear that Srivastava embellished testimony from his own playbook – these were the tactics that *Srivastava* used on his victims, not tactics ever deployed by any of the Defendants.

Srivastava testified that he and his company, Preadia, were defrauded. Meanwhile, the government, including the lead special agent at the trial, had evidence that Preadia itself was a fraud, executed by Srivastava who used it as a front to steal hundreds of thousands of dollars from Preadia investors. It had information that two government agencies, including the FBI, had reason to doubt Srivastava's reliability, credibility, and honesty. The defense lawyers in this trial had no knowledge that the government previously paid Srivastava for information. The government was able to paint Srivastava as an innocent, naïve, young investor out to save the world with early cancer detection. As the government argued stated in closing: "Let's talk for a minute about Gaurav Srivastava. That's the gentleman who came in and testified from California. He's the one that started the company to try to come up with a cure for cancer at a

very young age." Trial Tr. 3133. The government failed to disclose critical evidence that would enable the defense to dispel this misleading portrayal.

Srivastava did more for the government than present a young, ideological victim. Srivastava added knowledge and intent to the government's case where none might otherwise exist. Srivastava repeatedly testified that Douglas "personally verified" that Defendants had assets worth over $21 billion, that Douglas told him that he personally "verified the funds" that would be used to back the SBLC, that an escrow agent independently verified the funds, and made other assurances. Trial Tr. 1593; 1622; 1623. Other witnesses only testified that Douglas gave them information so that the alleged victims could verify the SBLC themselves. *See, e.g.*, Trial Tr. 405, 408, 448, 480, 484, 491, 496.

Srivastava also testified that he did not retain an attorney to represent him in the transaction because Douglas told him that he did not need a lawyer. Trial Tr. 1623. This stood in contrast to the other victim at trial, Janus Holder, who testified that Douglas encouraged him to obtain his own lawyer to review the proposed transaction and conduct his own due diligence. Trial Tr. 660-661. Srivastava also testified that Douglas told him that GMB had "several offices in New York and Dubai and other places", as well as in Panama. Trial Tr. 1594, 1611. This stood in contrast to the other victims who testified that they merely assumed that GMB had staff and offices and employees around the world, but did not testify that Douglas told him that GMB had any such offices or employees. Trial Tr. 468, 470, 547.

Srivastava also testified that Mignott vouched for Douglas and that Mignott talked to Srivastava about SBLCs, despite the fact that his previous statements provided that Mignott just verified on one occasion that his house was not in foreclosure. *See, e.g.*, Trial Tr. 1584.

The government used Srivastava to extract details to show "fraudulent intent" which it could not obtain from any other witness. It presented Srivastava as a young, naïve victim, intimidated by the Defendants. In fact, he was a savvy operator with extensive experience in interfacing with government agencies. It was able to present Srivastava's business as a legitimate operation with lofty goals, not the vehicle for fraud it actually was. Srivastava is a fantasist, a liar, and a con. The government was on notice and failed to tell either the Court or the defense. This is an egregious violation of its disclosure obligations, the full scope of which is not yet known to the defense. The defense requires additional discovery to determine the scope of the disclosure failure and what the relevant government representatives knew and when.

**V. Defendants can show good cause for their discovery requests.**

Defendants can establish good cause for their requests. The government failed at trial to comply with *Brady*, and it continues to be blindered to its obligations. In light of the government's limited disclosures, the Defendants have more questions than answers. The government must be compelled to comply with its constitutional obligations now.

Moreover, the government's actions with respect to Srivastava are part and parcel of the discovery inquiry. The diligence that the prosecution team exercised is all material to whether the *Brady* violation was reckless. Discovery on the extent of the prosecution's diligence, "what it does not know but could have learned," is therefore warranted. *Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc) (vacating conviction for failure to ask agency for material that could impeach a government witness's credibility). While it is entirely unclear from the March 2025 Disclosure is how the prosecution team in New Jersey came to learn that Srivastava worked as a CI with the FBI Los Angeles Office. Once the prosecution team chose to put Srivastava on the stand, they were "entitled to access … the agency file for each testifying CI", "[t]hose files should [have been] reviewed for discoverable information" and, although the prosecutor can

delegate the review of information, "[t]he prosecutor is ultimately responsible for compliance with discovery obligations." Department of Justice Manual § 9-5002. The government should have done this review for *Brady* and *Jencks* material to ensure that it complied with its *Brady* and *Jencks* obligations. At a minimum, the government should have exercised care in its obligation to be candid with the Court when it filed its September 2022 Application given that it was an *ex parte* application.

Discovery is warranted into the whether Srivastava's "handling agent" intentionally, recklessly, or negligently provided false information to the NJ prosecution team. Discovery may reveal evidence of misconduct that violated the Defendants' rights and bears on the government's credibility. Other aggravating factors, like a prosecutor's attempt to conceal a violation, are relevant to the Defendants' claims here. *Cf. Banks v. Dretke*, 540 U.S. 668, 696 (2004) (explaining that a "rule ... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process"); *see also Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006) (holding that a prosecutor must investigate perjured testimony and may not avoid the obligation to do so by "remaining willfully ignorant of the facts." (citations omitted)).

A new trial might also be warranted if the government violated the Jencks Act, 18 U.S.C. 3500(b). Srivastava's undisclosed FBI files might have been discoverable under the Jencks Act given that Srivastava testified at length about Preadia, and his familiarity with oil and gas transactions. *See* 18 U.S.C. 3500(b) (mandating disclosure of statements of witness which relate [ ] to the subject matter as to which the witness has testified.") "The purpose of the Jencks Act and Rule 26.2 is to permit defense counsel to have the materials necessary to impeach a

Government witness." *United States v. Suarez*, Crim. No. 09-932, 2010 WL 4226524, at *5 (D.N.J. Oct. 21, 2010)).

Accordingly, sanctions are appropriate when material Jencks Act violations occur, which can include granting a new trial. *United States v. Russell*, Crim. No. 16-396, 2018 WL 2088282, at *2 (S.D.N.Y. May 4, 2018) (granting a new trial for inadvertent failure to disclose Jencks Act material where the witness "was a critical witness for the prosecution" and the production "would have provided substantial grist for cross-examination of [the witness] and impeachment of his credibility."); *United States v. Peterson*, 116 F. Supp. 2d 366, 368 (N.D.N.Y. 2000) (ordering a new trial for a Jencks Act violation where notes that were not produced "would have created additional discrepancies not present at trial in the testimony of [a witness] that would have had a significant chance of creating reasonable doubt in the minds of enough jurors to prevent Defendant's conviction.")

Finally, "the materiality of withheld evidence must be 'considered collectively, not item by item.'" *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 312 (3d Cir. 2016) (quoting *Kyles*, 514 U.S. at 436). "[T]he government cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative." *Carriger v. Stewart*, 132 F.3d 463, 481 (9th Cir. 1997) (en banc). Collective analysis requires assessing the effect of the entire iceberg, not merely the tip disclosed here. The government's blindered view of its *Brady* obligations demands removing all discretion from the prosecutors to determine what is impeaching or maybe even exculpatory and compelling production of the objective categories of information specified below.

### A. Defendants request that the government be compelled to provide relevant documents and answer narrow interrogatories.

The government should be compelled to produce documents pursuant to *Brady* and its progeny, and 18 U.S.C. § 3500, and/or to provide answers about the following subjects:

- As to Srivastava,
  - The scope of Srivastava's relationship with any United States Government agency, including date that he first began working with the government and the subsequent timeline;
  - Training he received (i.e., in covert operations);
  - A full accounting of all renumeration, compensation, and other benefits (*i.e.,* immigration abeyance) he received for CI work;
  - A copy of all reports referenced in the March 2025 Disclosure (even in redacted form);
  - Every documented credibility assessment in the files of the Tampa FBI office, the Los Angeles FBI office, and the other government agency referenced in 2021 Supervisory Report;
  - All notes, documents, 302s, or any other documents concerning the investigation into Srivastava's fraud that have not otherwise been referenced or turned over;
- As to the government,
  - A general explanation of the FBI's "Distribution List," how one gets on the list, and how one receives and is able to access information;
  - A specific explanation of how and when SA Elizabeth Hornberger and Anthony Czajkowski were placed on Srivastava's "Distribution List," and when they respectively received and accessed documents;

- All notes from the NJ prosecution team regarding discussions with the Los Angeles Field Office regarding Srivastava; and
- Any notes, documents, including dates and communication between the AUSAs / Newark Field Office and the Los Angeles Field Office, the Tampa Field Office and/or any other FBI office or government agency concerning Srivastava's honesty, reliability, credibility, or accusations of fraudulent conduct.

Proposed document requests, which cover the various issues discussed above, are attached hereto as Exhibit H. Defendants also request that the Government be compelled to answer certain narrow, targeted interrogatories, attached hereto as Exhibit I.

B. **Request for an evidentiary hearing.**

The prosecution team has not yet had to submit sworn statements regarding its conduct. It has presented a legal brief – the March 2025 Disclosure – and has otherwise informally advised Defendants and the Court about its positions. At this point, to avoid any further delay, the relevant government representatives should go under oath and be subject to cross-examination by Defendants and inquiry by the Court. Accordingly, Defendants request an evidentiary hearing at which SA Elizabeth Hornberger, AUSA Joshua Haber, and Srivastava's "Handling Agent" from the FBI's Los Angeles Office should be compelled to testify, at a minimum, regarding:

- what they learned about Srivastava, his work for the FBI, and the "Other Governmental Agency", and when they learned it;
- what steps they took to verify the representations made in the September 2022 Letter to the Court;

- Hornberger's receipt of the September 16, 2021 communication that she was sent about the FBI's fraud investigation of Srivastava and the basis for the Government's position that she was not aware of it; and
- Srivastava's "Handling Agent" from the FBI Los Angeles office should be required to testify regarding the steps he took to verify the information contained in the Government's September 2022 Letter and the nature of the FBI's concerns regarding Srivastava's credibility.

## CONCLUSION

For the reasons stated above, the Government should be compelled to produce all documents responsive to the discovery requests, to submit answers to the proposed interrogatories, and to present the testimony of AUSA Joshua Haber, FBI SA Elizabeth Hornberger, and Srivastava's Los Angeles Handling Agent at an evidentiary hearing.

Dated: August 5, 2025

GELBER & SANTILLO PLLC

/s/ Kristen M. Santillo
Kristen M. Santillo
Fern Mechlowitz
24 Church Street, 2nd Floor
Montclair, NJ 07042
Tel: (212) 227-4743
ksantillo@gelbersantillo.com

*Counsel for Defendant*
*Jerrid Douglas*

DUANE MORRIS, LLP

/s/ Melissa S. Geller
Melissa S. Geller
22 Vanderbilt
335 Madison Ave. 23rd Floor

New York, New York 10017
Tel:212-692-1000
msgeller@duanemorris.com

Eric R. Breslin
200 Campus Drive, Suite 300
Florham Park, New Jersey 07932
Tel: 973-424-2000
erbreslin@duanemorris.com

*Attorneys for Defendant Harold Mignott*

s/ Alison Brill
Alison Brill
Assistant Federal Public Defender
800 Cooper Street
Suite 350
Camden, New Jersey 08102
(609) 489-7457
alison_brill@fd.org

*Attorney for Defendant Roy Gillar*